# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FANNIE E. BROWN,

     *Plaintiff*,

     v.

HOWARD UNIVERSITY HOSPITAL,

     *Defendant*.

Civil Action No. 14-1019 (RDM)

## **MEMORANDUM OPINION AND ORDER**

This case is before the Court on Defendant Howard University Hospital's ("Howard")

motion for summary judgment. *See* Dkt. 12. Plaintiff Fannie Brown was 60 years old when she

began working for Howard as the Director of Graduate Medical Education ("GME") in January

2011. She was 62 years old when she was fired in December 2012. She promptly filed an

administrative complaint and then a lawsuit alleging that her termination was based on her age.

After the parties engaged in more than six months of discovery, Howard moved for summary

judgment. Howard contends that it fired Brown because her position was eliminated as part of a

nondiscriminatory restructuring designed to avoid duplication of duties. Brown, in turn, argues

that Howard simply hired a younger employee, who previously worked elsewhere at Howard, to

perform her duties and that the alleged restructuring was pretextual. The Court concludes that

disputed issues of material fact exist as to whether the nondiscriminatory reasons that Howard

offers were pretext for discrimination and whether Brown was in fact fired because of her age.

Howard's motion for summary judgment is, accordingly, **DENIED**.

## I. BACKGROUND

For purposes of the present motion, the Court construes the facts in the light most favorable to Brown, who is the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Fannie Brown was 60 years old when she began working for Defendant Howard University Hospital in January 2011 as the Director of Graduate Medical Education ("GME Director"). Dkt. 15 at 3. Her primary responsibility in this role was to maintain Howard's accreditation with the Accreditation Council for Graduate Medical Education ("ACGME"). *Id.* Her other duties included overseeing the curriculum and orientation for residency program coordinators, supervising office staff, revising an internal manual to ensure compliance with ACGME requirements, signing off on reimbursement requests and invoices, and organizing a retreat for Howard's graduate medical education staff. *Id.* at 3–4; *see also* Dkt. 15-5 at 1–3. According to Howard's official job posting for the GME Director position, a qualified candidate had to have either a master's degree or Ph.D. and at least seven years of GME experience or, alternatively, a medical degree and at least five years of experience as a program director with a demonstrated record of success with accreditation. Dkt. 15-5 at 3. Brown met these criteria: She earned her Ph.D. in higher education administration and sociology from the University of Iowa in 1983, *see* Dkt. 12-1 at 3–4 (Brown Dep. 8–9), and she had more than a decade of GME experience, *see id.* at 4 (Brown Dep. 10–12); *see also* Dkt. 15 at 4.

Before Brown joined Howard, Dr. Robin Newton performed most of Brown's duties. Dkt. 15 at 4. After Brown's hiring, Newton was her supervisor and held two positions: Designated Institutional Official ("DIO") and Senior Associate Vice President for Clinical Affairs and Quality. *Id.* The DIO's role was to "ensure that the GME programs complied with

the accrediting body requirements." *Id.* The DIO thus worked closely with Brown, whose core responsibilities also focused on maintaining the school's accreditation.

In late 2012, the Howard GME program underwent the reorganization that lies at the heart of this case. Dr. Peter Sealy took over Newton's role as the DIO and became Brown's supervisor. Dkt. 12-3 at 1 (Sealy Aff. ¶ 2). Like Newton, Sealy's time was not devoted exclusively to the DIO position; in his case, Howard specified that Sealy would spend 60% of his time on the DIO role and 40% of his time on "clinical services in internal medicine," and "educational activities." Dkt. 15-9 at 1 (August 9, 2012, Letter from Larry Warren to Peter Sealy). Brown's role remained unchanged, and she reported directly to Sealy. Dkt. 12-1 at 9 (Brown Dep. 29–30). On December 6, 2012, however, Sealy handed Brown a Notice of Separation informing Brown that her employment with Howard "was terminated effective December 27, 2012," but that, "to reduce confusion," December 6 would be her last day of work. Dkt. 12-5 at 1. The Notice of Separation explained that, "as a consequence of . . . restructuring across . . . Howard," Brown's "position [was] being eliminated." *Id.* The letter offered no other reasons for the termination and consisted primarily of administrative and logistical matters, such as offering Brown a small severance payment and explaining her options regarding health insurance and career assistance. *Id.*

During the meeting at which Brown was fired, Sealy acknowledged that her performance was not the reason for her termination, reiterated that Brown was being discharged due to the restructuring, and explained that he was going to perform Brown's previous duties himself. Dkt. 12-1 at 11–12 (Brown Dep. 39–42). Perplexed about how Sealy could perform these additional duties along with his other responsibilities, Brown asked Sealy whether he planned to replace her with Alonda Thompson, *see id.* at 13 (Brown Dep. 45), a Howard employee with whom Sealy

was already familiar and who was younger than 40 years old, Dkt. 12-7 (Thompson Aff.); Dkt. 12 at 6 (stating that Thompson was "under the age of [40]"); Dkt. 15-1 at 4 (agreeing).  Sealy did not respond.  Dkt. 12-1 at 13 (Brown Dep. 45).

Brown searched for jobs in Washington, D.C., but soon moved to Texas, where she had lived before taking the job at Howard, because she was unable to afford the cost of living in Washington.  Dkt. 12-1 at 4–5 (Brown Dep. 12–13).  She later learned from a former co-worker that Thompson had moved into the GME office in February 2013—two months after Brown's termination—and had assumed a job that, according to Brown, was substantially similar to the position she previously held.  *Id.* at 14–17 (Brown Dep. 52–64).

Contending that she was fired because of her age, Brown contacted the Equal Employment Opportunity Commission ("EEOC") in April 2013, *see* Dkt. 15-12, and filed a formal discrimination complaint against Howard in May 2013, *see* Dkt. 15-13 at 1.  The EEOC forwarded the complaint to Howard on August 13, 2013, and directed it to prepare a response by August 27, 2013.  *Id.* at 2.  Howard did not meet that deadline but on August 29, 2013, posted a job announcement for "GME Administrator and Development Manager."  Dkt. 12-6.  The posting described a job similar—but not identical—to the one Brown previously held.  *Compare* Dkt. 12-2 (job description for Brown's position), *with* Dkt. 12-6 (job description for new position).  Among other differences, the new position required only five (as opposed to seven) years of GME experience for applicants holding a master's degree.  Dkt. 12-6 at 1.  The hiring window for his new position was just one week, and, given the Labor Day weekend, included only four business days.  *Id.*  Howard ultimately chose Thompson for the role, *see* Dkt. 12-9, although the parties differ as to when.  The Court will address that point in greater detail below.

Howard eventually responded to Brown's EEOC complaint on February 20, 2014, more than five months late. Dkt. 15-16. The response explained that Brown was fired "following a restructuring of her department." *Id.* at 4. Howard further explained that Sealy "would absorb the daily functions" of the "directorial duties" associated with Brown's position, rendering that position "duplicative." *Id.* at 5. The response also "acknowledge[d] that the GME Administrator and Development Manager works in many of the capacities of review, coordination, and maintenance of departmental policies and programs that were once responsibilities of the Director of Graduate Medical Education." *Id.* In other words, Howard recognized that many of the responsibilities of the new position overlapped with the one Plaintiff previously held. But it argued that "the positions [were] distinct" because "[t]he newly created position has less rigorous education, experience, and core competency requirements," and did "not offer the leadership responsibility deemed appropriate in the Director position." *Id.* Howard further argued that "the [new] position was advertised from August 29, 2013, through September 4, 2013," and that Brown "was not in any way precluded from applying for future employment" if she had so desired. *Id.*

The EEOC issued Brown a right-to-sue letter on March 18, 2014, *see* Dkt. 1 at 2, and she filed suit in this Court on June 14, 2014, *see* Dkt. 1. Although the complaint does not specify the statutory foundation for Brown's claims, it accuses Howard of discharging her based on her age, *see* Dkt. 1 at 3, and the parties treat the complaint as a single count alleging discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq. See, e.g.*, Dkt. 12 at 7; Dkt. 15 at 2. The Court will treat it the same way.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 permits a court to grant summary judgment only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is "material" if it is capable of affecting the outcome of the litigation.  *Liberty Lobby*, 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*  When, as here, the defendant has moved for summary judgment on the theory that the record does not contain any evidence supporting the plaintiff's claim, the movant still "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Without such a showing, the case must proceed so that a factfinder can settle genuine disputes of material facts.

## III.  DISCUSSION

The ADEA, in relevant part, prohibits an employer from "discharg[ing] any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  In evaluating a claim for wrongful termination under the ADEA, and absent direct evidence of discrimination, courts apply the familiar framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 26 (D.C. Cir. 1997).  Under that framework, a plaintiff must first make a *prima facie* case that her termination was the result of illegal discrimination.  *Id.*  If she does so, the burden shifts to her former employer "to articulate some legitimate, nondiscriminatory reason" for the termination.  *McDonnell Douglas*, 411 U.S.

at 802.  The plaintiff then has an opportunity to show that the proffered reason was pretext for

discrimination.  *Id.* at 804.

As the D.C. Circuit has recognized, however, "by the time [a] district court considers an

employer's motion for summary judgment . . . the employer ordinarily will have asserted a

legitimate, non-discriminatory reason for the challenged decision."  *Brady v. Office of Sergeant

at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  And once that has happened, the existence of a

*prima facie* case is irrelevant and "the district court need not—*and should not*—decide whether

the plaintiff actually made out a prima facie case under *McDonnell Douglas*."  *Id.* at 494

(emphasis in original).  Instead, the Court "must resolve one central question:  Has the employee

produced sufficient evidence for a reasonable jury to find that the employer's asserted non-

discriminatory reason was not the actual reason and that the employer intentionally discriminated

against the employee . . . ?"  *Id.*  In *Brady*, the D.C. Circuit considered a claim under Title VII,

but the approach it endorsed applies with equal force to age discrimination claims under the

ADEA.  *See, e.g.*, *Aliotta v. Bair*, 614 F.3d 556, 564–65 (D.C. Cir. 2010).

Howard raises three arguments in support of its motion for summary judgment:  (1) It had

a legitimate, nondiscriminatory reason to fire Brown; (2) Brown was not similarly situated to

Thompson, who became the GME Administrator and Development Manager after Brown was

fired; and (3) Brown cannot recover for Howard's failure to hire her for the GME Administrator

and Development Manager position because she did not apply for it.  As explained below,

Howard's second and third arguments misconceive the nature of the dispute; as *Brady* explains,

the only question the Court must—or should—consider at this time is whether Brown has

"produced sufficient evidence for a reasonable jury to find that" Howard's asserted

nondiscriminatory reasons for firing Brown were "not the actual reason[s]" for firing her and that

Howard "intentionally discriminated against" Brown.  *Brady*, 520 F.3d at 494.

## A.   Howard's Asserted Nondiscriminatory Reasons

Howard contends that its decision to discharge Brown was based on its "written and

actual restructuring plan" and that, far from concealing a discriminatory motive, this plan was

intended to "increas[e] operational efficiencies, remov[e] redundancies, and address[] ongoing

fiscal concerns of Howard University in general and the Hospital in particular."  Dkt. 12 at 11-

12.  Howard has maintained from the start that it eliminated Brown's position due to its

"restructuring."  *See* Dkt. 12-5 at 1; Dkt. 15-16 at 4.  That is what it said in the Notice of

Separation.  Dkt. 12-5 at 1.  It is also what Howard told the EEOC in its position statement,

where it further explained that the Hospital concluded that Brown's position was no longer

necessary because Sealy was going to perform many of the tasks her position required.  *See* Dkt.

15-16 at 5 (labeling Plaintiff's position as "duplicative"); Dkt. 12 at 11.  And, in her deposition,

Brown testified that Sealy told her, when they met on December 6, 2012, that he would assume

her functions as part of the restructuring.  Dkt. 12-1 at 12 (Brown Dep. 42).  The question for the

Court is thus whether Brown has "produced sufficient evidence for a reasonable jury to find that"

this explanation was "not the actual reason" for firing her and that she was, in fact, a victim of

intentional discrimination.  *Brady*, 520 F.3d at 493.

Although a close question, the Court concludes that Brown has carried this burden.

Brown's theory of the case is that no meaningful restructuring ever took place—or was ever

intended.  Rather, in her view, she was replaced by Thompson, a younger worker, under the

guise of a restructuring.  Brown further posits that Howard attempted to hide this plan by telling

Brown that Sealy would assume her duties and by not officially moving Thompson to Brown's

former position until months after Brown was fired.  Howard, in response, disagrees with each of these contentions.  It argues that the restructuring was both real and necessary to respond to budgetary criticisms; that Sealy did take on additional responsibilities previously handled by Brown; that Thompson was not hired to assist Sealy until September 2013; and that her role was not the same role that Brown had previously played.  The Court need not—and should not—resolve these factual disputes, but instead must merely decide whether a reasonable jury might embrace Brown's view of the events.

Although there is no direct evidence that the restructuring was pretextual, Brown has identified a number of circumstances—some disputed, some not—that support her theory.  As an initial matter, the Court notes that Howard has offered little evidence that the decision to dismiss Brown was an incidental byproduct of a more fundamental decision to restructure the GME program.  To the contrary, as far as the Court can discern, the only significant restructuring that occurred—at least that finds support in the existing record—is that Brown's position was eliminated.  In support of its motion, Howard submitted a document entitled "Transition Plan for DIO/Associate[] Dean for Graduate Medical Education."  *See* Dkt. 12-4.  That document says nothing about eliminating the position of GME Director or anything about a significant restructuring; indeed, it mentions only three other positions.  With respect to the "Program Director Appointment–Internal Medicine Residency," it identifies the individual who was chosen to fill that position.  *Id.*  It further notes that "no change" would be made to the "Associate Program Directors" positions.  *Id.*  And, as to final one—Program Manager—it notes that Alonda Thompson would provide support to Dr. Sealy in the office of DIO.  *Id.*

This document is notable for two additional reasons.  First, to the extent Howard claims that its plan was for Sealy to perform the functions Brown previously performed while she

worked under Newton (Sealy's predecessor), the record is far from clear.  The restructuring memorandum asserts that Sealy would devote 80% of his time to "the positon of DIO/Associate Dean for GME," Dkt. 12-4 at 1, but Sealy's formal offer letter from August 2012 states that "60% of [his] time and effort" would be devoted to the DIO role, while the remaining 40% of his time would be spent on "clinical services in internal medicine . . . and educational activities." Dkt. 15-9 at 1.  Moreover, despite bearing the burden for summary judgment purposes, Howard has failed to offer any meaningful support for the critical premise that it intended to shift Brown's workload to Sealy.  There is no evidence that Sealy actually did any more than Newton had, that he actually took over any of Brown's duties, or that Howard ever intended that he do so.  Brown's deposition, moreover, casts some doubt on whether Sealy could have possibly taken on so much added responsibility.  *See* Dkt. 12-1 at 12 (Brown Dep. 42–44).

Second, the March 2012 memorandum's assertion that Thompson "will join Dr. Sealy in the office of DIO to provide administrative leadership to the office," Dkt. 12-4 at 1, casts some doubt on the position Howard took with the EEOC.  In responding to Brown's EEOC complaint, Howard argued that Brown's position was abolished for legitimate reasons and that "[t]he creation of an administrative role nearly 8 months later [was] not contemporaneous with [Brown's] job abolishment, and therefore creates no legal inference of discrimination." Dkt. 15-16 at 3.  That assertion, however, is hard to square with a memorandum from months *before* Brown was fired stating in apparently conclusive terms that Thompson would take on the administrative role for the DIO program.

This inconsistency, moreover, echoes one of the substantial factual disputes between the parties.  Brown contends that Thompson filled essentially the same role that she occupied before she was fired.  Howard, in contrast, argues that Thompson's role is fundamentally different and

that the position was not created or filled until months after Brown was fired.  It also contends

that Brown was free to apply for the position that Thompson was given, and that she alone is to

blame for not having discovered the job posting and applied for the job.  Much of this, of course,

is flawed if, in fact, a decision had been made months earlier to give the position to Thompson

and only to advertise the position "[i]n her absence."  Dkt. 12-4 at 1.

A reasonable jury could also view Howard's brief advertisement of the position as

supportive of Brown's theory of the case.  Howard posted the job announcement, as noted above,

only after Brown filed her administrative complaint with the EEOC.  *Compare* Dkt. 12-6 *with*

Dkt. 15-13.  It advertised the position for only one week—a period that included only four

business days due to the Labor Day holiday.  *See* Dkt. 12-6 at 1.  And Howard said nothing to

Brown about the potential opening, despite the Hospital's knowledge that Brown was aggrieved

by her dismissal.  A reasonable jury might construe this process as pretextual—designed merely

to maintain Howard's position that there was not a preordained plan to pass all (or at least most)

of Brown's duties to Thompson.

The significant overlap between Plaintiff's position and the allegedly new position that

Thompson occupied further supports the conclusion that the case is not amenable to resolution

on summary judgment.  Howard argues that there were "differences in" the two positions, and

thus this is not simply a case in which a younger employee replaced an older one.  Dkt. 20 at 4.

But the two positions are undeniably similar in scope.  *Compare* Dkt. 12-2 (job description for

Plaintiff's position), *with* Dkt. 12-6 (job description for new position).  Defendant described the

new position, for instance, as "serv[ing] as senior operational manager for accreditation in the

Office of Graduate Medical Education" who was "[r]esponsible for the coordination and

management of all [ACGME] program reviews."  Dkt. 12-6 at 1.  Brown's job, meanwhile,

required her to "[m]aintain[] [Howard's] [ACGME] accreditation" and to "[o]versee[] the
creation, distribution, compilation and maintenance of documents related to internal reviews of
the accredited and non-accredited programs under the ACGME, as well as the Institutional
Review." Dkt. 12-2 at 1.  Additionally, the Court cannot ignore that it appears that Howard
created the description of the new position on August 29, 2013—*after* it received notice that
Brown was alleging she was fired for discriminatory reasons. *See* Dkt. 12-6 at 1; Dkt. 15-13 at
1. This lag time is arguably suspect given that Howard openly admits—indeed, emphasizes—
that it planned to create this position nearly a year earlier. *See* Dkt. 12-4.

Notwithstanding Howard's contention that there were differences between the two
positions, *see* Dkt. 20 at 4, the only evidence it has introduced to compare the two positions are
the job descriptions themselves.  But labels, qualifications, and salary—the evidence upon which
Howard relies, *see id.*—fail to address the more vital questions whether Brown and Thompson,
in fact, performed substantially the same roles and whether Howard intended that they do so.  On
that question, the record is strikingly silent.  Although Sealy and Thompson submitted
declarations in support of Howard's motion, for example, neither says anything about the duties
that Thompson actually performs.  Rather, the only evidence in the record that addresses this
point is Brown's own deposition, and she has averred that, based on her experience and the
description of the new position, the new position is the same job she previously held.  *See* Dkt.
12-1 at 17 (Brown Dep. 64).  That evidence is admittedly speculative, but it is all the Court has
before it—even though it is Howard's burden to show there is no genuine dispute of material fact
at this stage.

The parties also dispute when Thompson took on her new duties assisting the DIO.
Brown points to an email purportedly from Thompson to a co-worker sent on March 22, 2013,

which is signed "Alonda E. Thompson, MA, *GME Administrator and Development Manager*."

*See* Dkt. 15-10 at 1 (emphasis added).[1]  Howard, in contrast, insists that Thompson merely

relocated to Sealy's office in March 2013 due to a shortage of office space, that she continued to

serve as a "Program Manager" at that time, and that she "did not assume the duties and title of

GME A&D Manager until after the position was posted and she accepted the position as of

September 23, 2013."  Dkt. 12 at 13.  Thompson, similarly, has filed an affidavit averring that

she moved offices in March 2013, but "did not assume the duties or title of GME A&D Manager

under the supervision of Dr. Sealy" until September 23, 2013.  Dkt. 12-7 at 2 (Thompson Aff.

¶ 8).  At the very least, Brown has shown there is a genuine dispute regarding a material issue of

fact on this point.

      Finally, Howard argues that its restructuring was prompted by budgetary concerns, *see*

Dkt. 12 at 11–12, and it observes in its reply brief that Brown was paid $125,000 per year, while

the new position that Thompson filled came with a salary of $85,000, *see* Dkt. 20 at 6.  Thus,

Howard argues, eliminating Brown's position and replacing it with a more junior role "served

the purpose of a budget reduction for Defendant."  *Id.*  Although Howard has consistently

---

[1] Howard argues that the Court should not consider the email because it is "unsworn hearsay and unauthenticated."  Dkt. 20 at 8 n.5.  Notably, however, Howard argues only that the email is unauthenticated—not that it is actually inauthentic—even though it maintains control over its own email system and is presumably in the best position to know whether the email is not genuine.  This issue was not raised, moreover, until Howard's reply brief, and so Brown has not had a chance to rebut the notion that it is hearsay.  The Court notes, however, that Federal Rule of Evidence 801(d)(2)(D) provides that a statement "is not hearsay" if it "is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Although the Court will not decide without further argument whether this evidence will be admitted at trial, it sees no reason to ignore the email at this stage of the proceeding based on a questionable evidentiary objection raised in a reply brief. *See, e.g.*, *Slate v. Am. Broad. Cos., Inc.*, 941 F. Supp. 2d 27, 46–47 (D.D.C. 2013) (holding that "e-mail evidence submitted by the defendants is appropriate for consideration on summary judgment" in part because "there is no evidentiary basis to conclude that any of th[e] . . . e-mails are not authentic").

pointed to the need to avoid job duplication, *see, e.g.*, Dkt. 15-16 at 5, there is no evidence that, before this litigation, it relied on the difference in the salaries paid to Brown and Thompson to support is actions.  The termination letter that Sealy delivered to Brown made no mention of a salary differential, instead explaining in just one sentence that Brown's position had been eliminated "as a consequence of . . . restructuring" at Howard.  Dkt. 12-5 at 1.  Howard's response to Brown's EEOC complaint offered a more lengthy explanation, but it too omitted any mention of salary differential.  *See* Dkt. 15-16 at 4–5.  Instead, that submission asserted that Howard eliminated Brown's position due to "restructuring" and the "duplicative nature" of the GME Director position.  *Id.* at 5.

Brown contends that the salary differential argument that Howard proffers actually supports her position because it shows the type of "shifting rationale[]" that is "probative of pretext."  Dkt. 15 at 15.  The D.C. Circuit has explained that "shifting and inconsistent justifications are 'probative of pretext,'" and refused to affirm summary judgment in a case where an employer offered in litigation a different reason for terminating an employee than the rationale it had previously relied upon.  *Geleta v. Gray*, 645 F.3d 408, 413–14 (D.C. Cir. 2011) (quoting *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001)); *see also Domínguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) ("[W]hen a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual."); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.").

There is admittedly some overlap between a plan to save money by eliminating duplication and a plan to save money by reducing some duplication while shifting the remaining

responsibilities to a lower paid employee.  But having concluded that there exists a genuine

factual dispute about whether the duplication rationale is pretextual, the Court cannot conclude

that a cost-saving rationale that relies, at least in part, on that same rationale is sufficient to grant

summary judgment in favor of Howard.  At the same time, moreover, the Court cannot rely

exclusively on the pay differential between Howard and Thompson because that rationale was

not raised when Brown was fired or when she filed her administrative complaint.  Indeed, had

Howard told Brown at the time she was fired that it was simply seeking to reduce the salary for

her position, she might well have agreed to a salary reduction.  There is nothing in the ADEA

that prevents an employer from hiring a younger employee to save money, *see, e.g.*, *Luhrs v.

Newday, LLC*, 326 F. Supp. 2d 30, 36 (D.D.C. 2004); *cf. Hazen Paper Co. v. Biggins*, 507 U.S.

604, 611–13 (1993) (holding that an employer does not violate the ADEA by replacing an older

employee with a younger one to avoid paying pension benefits), but where a genuine dispute of

fact exists about whether such a cost-savings rationale is pretextual, the Court cannot grant

summary judgment.

It bears emphasis that Howard is correct that there is little direct evidence in the record

that it fired Brown based on her age.  At summary judgment, however, the relevant question is

whether the plaintiff has "produced sufficient evidence for a reasonable jury to find that the

employer's asserted non-discriminatory reason was not the actual reason and that the employer

intentionally discriminated against the employee."  *Brady*, 520 F.3d at 493.  "[A] plaintiff's

discrediting of an employer's stated reason for its employment decision is," moreover, "entitled

to considerable weight" in this inquiry.  *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290

(D.C. Cir. 1998) (en banc).  Here, Brown has shown that she was fired and replaced in arguably

the same position by a younger employee.  She has further identified reasons that a reasonable

jury might doubt the nondiscriminatory rationale that Howard has offered for the decision to discharge her.  The Court concludes that, for present purposes, this evidence is sufficient to satisfy Brown's burden at summary judgment.

**B.      Remaining Arguments**

As noted above, Howard also argues that Brown and Thompson were not similarly situated and that, accordingly, Thompson's hiring as the GME Administrator and Development Manager says nothing about whether Brown was lawfully fired from her position as GME Director.  Dkt. 12 at 6–8.  To the extent Howard is challenging Brown's *prima facie* case, that argument is irrelevant.  *See Brady*, 520 F.3d at 494.  And even if the question whether Brown and Thompson were similarly situated were still relevant, that question is subject to a reasonable factual dispute for the reasons discussed above.  As a result, the question whether Brown and Thompson were similarly situated is, accordingly, a factual question for the jury.  *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016) ("The question of whether employees are similarly situated in order to show pretext ordinarily presents a question of fact for the jury." (internal quotation marks omitted)).

Finally, Howard argues that Brown never applied for the GME Administrator and Development Manager position, and thus she cannot complain about Howard's failure to hire her for that position.  Dkt. 12 at 14.  That contention, however, misstates Brown's position.  She does not argue that she should have been hired for the new GME Administrator and Development Manager position but instead that she should not have been fired from her position as GME Director.  The history of Howard's actions with respect to the new position is relevant, on this theory, to show that the alleged reorganization was pretextual.  A reasonable jury could also find relevant that Howard failed to mention to Brown that it planned—well before her

firing—to create a new position for which she was admittedly qualified and that the job opening

was posted for only four business days.  Thus, although Howard is correct that Brown cannot

recover based on its failure to hire her for the new position, she can rely on the circumstances

surrounding the creation of, and hiring for, that position as evidence that she was fired because of

her age.

## IV.  CONCLUSION

For the reasons discussed above, Howard's motion for summary judgment, Dkt. 12, is

**DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 25, 2015